## CROWELL v. BAKER OIL TOOLS, Inc.
### No. 8850.

Circuit Court of Appeals, Ninth Circuit.

Nov. 7, 1938.

Joseph F. Westall and Henry G. Bodkin, both of Los Angeles, Cal., for appellant.

Oscar A. Mellin, of Oakland, Cal., and Benjamin F. Bledsoe and Kenneth K. Wright, both of Los Angeles, Cal., for appellee.

Before GARRECHT and HANEY, Circuit Judges, and ST. SURE, District Judge.

HANEY, Circuit Judge.

A decree adjudicating to be valid and subsisting, a license agreement from appellant to appellee, and a license agreement from appellee to appellant, is challenged by the latter.

Appellee filed a bill alleging ownership of patent No. 1,685,307 issued to Baker, September 25, 1928; patent to Baker No. 1,748,007, issued February 18, 1930; and patent to Mellin, No. 1,859,593, issued May 24, 1932; and infringement thereof by appellant. Appellant answered, alleging among other things that he had a license from appellee to manufacture and sell the subject matter of each claim alleged to be infringed. In a counter-claim appellant alleged infringement of patent No. 1,432,017, re-issue patent No. 16,516, issued to him on October 17, 1922 and January 4, 1927, respectively. In answer to the counter-claim appellee alleged that on August 1, 1935, appellant had granted it a license to manufacture and sell devices embodying the inventions of the last named patent.

Had further pleadings been permitted, the issues thereunder would have been, ac-

cording to briefs of counsel, whether or not the license granted appellee had been rescinded by appellant for (1) fraud, (2) mistake, or (3) failure of consideration. Such were the issues presented to the court below, and in part are the issues raised here.

It appeared that in 1927, appellant brought suit against appellee charging infringement of re-issued patent No. 16,516. The Lorraine Corporation, hereinafter referred to as Lorraine, having an interest under a license granted it by appellant prior to and on May 7, 1930, was made a party. Appellee's officers conferred with appellant in regard to settlement of the suit in 1931, and thereafter. Appellee's attorney, Mellin, testified that on March 21, 1932, he prepared an agreement for execution by appellant and appellee by which appellant was to execute a license, which was attached thereto, as soon as he was able to cancel the license granted Lorraine, and had given a copy thereof to appellant. Appellant denied that he had ever seen the agreement. Sometime during the year 1932, appellant brought suit against Lorraine to cancel the license he had granted.

On August 25, 1932, appellant wrote appellee setting forth the terms on which he would dismiss the infringement suit. Mellin shortly afterwards prepared a license agreement which was presented to appellant. One of appellee's officers testified that appellant said he was delaying the matter because he was then unable to grant a license, which testimony appellant denied.

Nothing further was done until June, 1934. After conferences with appellee's officers, appellant on June 7, 1934, wrote appellee stating his terms for granting appellee a license. Appellant testified that during the month he employed Mellin as his attorney in the suit against Lorraine, at the suggestion of one of appellee's officers. The officer mentioned testified that the employment was suggested by appellant. An amended bill was prepared and filed by a firm with which Mellin was associated.

On July 7, 1934, Mellin prepared an agreement to settle pending litigation and forwarded them to appellee. On August 7, 1934, appellant and appellee executed an "Agreement To Settle Pending Litigation". By the agreement appellant agreed to dismiss the infringement suit against appel-

lee and to execute a license agreement attached thereto in the event that he was successful in the suit against Lorraine. Appellant testified that Mellin represented the agreement to be one for dismissal of the suit only, and that he did not understandingly read it before he signed the same, and did not fully read the agreement until March 30, 1935. Mellin and one of appellee's officers testified that appellant examined the agreement closely. In addition, there was a change made in the license attached to the agreement, which was initialed by appellant.

Mellin was substituted of record as appellant's attorney in November, 1934 in the suit against Lorraine. The case was tried in January, 1935. After the special master before whom the case was tried had indicated that his findings would be in favor of appellant, on March 30, 1935, appellant wrote appellee saying that the object of the agreement executed on August 7, 1934 was to settle the infringement suit, that the same had been settled, which released both appellant and appellee from any further obligations under the agreement, and that he was not willing to sign the license agreement. On the following day, appellee wrote appellant stating that it would fully perform its obligations under the agreement of August 7, 1934, and that it demanded full performance on appellant's part. On April 6, 1935, appellant wrote appellee suggesting that a conference be had. Appellant testified that the letter was written at Mellin's suggestion. Although appellee on April 8, 1935 agreed to the conference, the same was not held.

On June 3, 1935, Mellin, at appellant's request wrote Halliburton Oil Well Cementing Company a letter giving notice that it was infringing appellant's patents.

At Mellin's request, appellant on July 15, 1935 wrote Mellin stating the terms which he "would require to be met in order to avoid further litigation" with appellee. The royalties asked for grant of a license by appellant to appellee were the same as those mentioned in the agreement of August 7, 1934. Appellant testified that on July 26, 1935, he had a conference with Mellin.

To understand the nature of the conversation it is necessary to refer briefly to the patents mentioned. All of the methods relate to a method or apparatus for cementing oil wells. The device is placed

between lengths of casing, the casing is lowered in the drill hole, cement is forced down the casing to the apparatus where it then is forced through apertures and sets around the casing. The most important features are the valves in the device, to control the outward flow of cement, and preventing the cement from returning into the apparatus and casing. None of the patents above mentioned are before us, except No. 1,859,648. The device shown in that patent consists of à length of casing, filled with cement or other lapideous material with the exceptions as follows: In the center is a small hole which leads into a larger aperture called a valve chamber. At the top where the hole enters the valve chamber is a seat against which a ball may rest. The bottom of the valve chamber is shaped so that the ball will not prevent passage of material into another hole, which enters another valve chamber. In the latter, the ball seats at the bottom of the valve chamber, but does not prevent material from entering the top of the chamber. Leading from the lower chamber are ports through the casing. In operation cement is pumped down the casing into the hole of the apparatus through the upper valve chamber, and into the lower valve chamber. The ball seats at the bottom of the lower valve chamber, thus forcing the cement to follow through the ports outside the casing. After completing the cementing operation the inward pressure of the cement causes the ball to seat at the top of the upper valve chamber, thus preventing further flow of the cement inwardly. After the cement is set the lapideous material is then drilled out.

At the conference on July 26, 1935, appellant testified that he sketched a device he wished to make, using the ball valve principle and stated that he wished to obtain a license from appellee for that purpose. It is admitted that he showed to Mellin a file of a patent application by appellant, which he later abandoned, showing use of lapideous material. Appellant's version of the conference was that insofar as the use of lapideous material was concerned as shown in appellee's patent No. 1,859,648 a license therefor was unnecessary because of prior publication, and that what he told Mellin he wished to get was a license to use ball valves. Mellin's version of the conference was that appellant did not state he wished to use ball valves, but wished to make the device shown in the abandoned application, which did not

use ball valves, and all that appellant requested was a license so that he could use a device with lapideous material free from any embarrassment arising from appellee's patent No. 1,859,648.

On July 27, 1935, appellant wrote Mellin stating that he was enclosing a copy of a patent, and also quoting a claim in his abandoned application. Referring to the agreement of August 7, 1934, the letter stated:

"You and Sutter gave me the rush act to get this agreement signed * * * you both misrepresented the full implications, in the agreement,—it was after you had prepared an amended complaint in my Lorraine case and had invoiced me for your services,—and with the anticipation of you representing me in the Lorraine case that I signed the agreement to settle pending litigation,—and with the expressed assurance from both of you that I was doing no more than terminating the present litigation.

"I am ashamed that I have been took in, —however, it was the result of misplaced confidence, and I am not going to stand hooked, and the quicker you see what you can do about it, the better."

Enclosed with the letter was a copy of a license agreement, which appellant said was acceptable to him, if the draft met with the approval of one of his attorneys.

The following day appellant again wrote Mellin, saying that the latter should try to bring appellant and appellee together in an equitable deal.

On July 31, 1935, Mellin answered the two letters last mentioned, denying that there was any fraud, and denying that he and appellant were in the position of attorney and client. He further suggested that appellant call him at a specified time. On August 1, 1935, appellant met Mellin at the latter's hotel room. Mellin presented a license agreement whereby appellant granted appellee a license, and another license agreement whereby appellee granted appellant a license under patent No. 1,859,648. Appellant testified that he asked Mellin if the latter license permitted him to use the ball type valves and that Mellin answered that such was the case, and that Mellin refused to permit him to have the same examined by counsel. Mellin testified that appellant asked him if the license granted to him permitted him to make a device with lapideous material, and that he refused to let appellant take the agreements

from his room, but told him to call his attorney.

The agreement granting a license to appellee contained the same scale of royalties that appellant had previously said were acceptable. It also contained the following:

"This agreement entirely cancels and renders void and of no effect all prior agreements both written and oral between the parties hereto."

The agreement granting a license to appellant, granted a license under patent No. 1,859,648 "with the expressed limitation that the devices which the said [appellant] may manufacture and sell must employ poppet type spring-pressed valves and shall not employ ball valves, or their equivalent, as shown in the patent."

On August 21, 1935, appellant paid Mellin a balance in full for services rendered in the Lorraine suit.

Subsequently, appellant began manufacture of a device using ball valves. On March 7, 1936, Mellin, on behalf of appellee, notified appellant of his infringement of the three patents owned by appellee. On March 17, 1936, appellant denied infringement. On March 26, 1936, the bill herein was filed. On May 18, 1936, appellant gave notice to appellee that he was rescinding the agreement by which he granted a license to appellee.

The trial court found that appellant was not induced by fraud or mistake to grant the license to appellee; that the monetary consideration was adequate; and that the effect of the license from appellee to appellant was not misrepresented. It entered a decree adjudicating both licenses to be valid, and dismissing appellant's counterclaim. Appeal was then taken by appellant.

▋ Some of the claims of patent No. 1,859,648 describe the valves as "ball valves", others describe them as "valve means", while still others describe them as "valves". Appellant contends that the license granted to him "meant that Crowell had a license to manufacture and sell the combination described in each and every claim of said Baker patent in which ball valves were not expressly included as elements". The claims not specifying "ball" valves, since they describe "valve means" or "valves" would include not only ball valves but possibly other valves. Appellant therefore argues that under those claims he was entitled to manufacture a

device using "ball" valves. We think that the limitation in the license that appellant "shall not employ ball valves or their equivalents" is applicable to all the claims, since the agreement does not restrict its application.

Civ.Code Cal. § 1689 provides in part:

"A party to a contract may rescind the same in the following cases only: 1. If the consent of the party rescinding * * * was given by mistake, or obtained through * * * fraud or undue influence. * * * 2. If, through the fault of the party as to whom he rescinds, the consideration for his obligation fails, in whole or in part * * *."

▋ Appellant contends that he granted the license to appellee by mistake, because he gave his consent, or granted the license, on the understanding that appellee was granting him a license to use ball valves; that therefore he had rescinded the license granted appellee pursuant to the above quoted statute, and the court below could not bring it into being again. This contention is based on the premise that appellant gave his consent by mistake. The trial court found to the contrary. Although appellant's testimony supports his contention, Mellin's testimony is contrary. In view of the conflict, we believe the trial court made no "serious or important mistake" and that its finding was not "clearly erroneous". Furrer v. Ferris, 145 U.S. 132, 134, 12 S.Ct. 821, 36 L.Ed. 649; National Reserve Ins. Co. v. Scudder, 9 Cir., 71 F.2d 884; Collins v. Finley, 9 Cir., 65 F.2d 625, 626; United States v. McGowan, 9 Cir., 62 F.2d 955, 957, affirmed 290 U.S. 592, 54 S.Ct. 95, 78 L.Ed. 522; Clements v. Coppin, 9 Cir., 61 F.2d 552, 558; Exchange National Bank v. Meikle, 9 Cir., 61 F.2d 176, 179; Jones v. Jones, 9 Cir., 35 F.2d 943, 945; Easton v. Brant, 9 Cir., 19 F.2d 857, 859; Gila Water Co. v. International Finance Corporation, 9 Cir., 13 F.2d 1, 2; Rules of Civil Procedure, rule 52 (a), 28 U.S.C.A. following section 723c.

It is also contended that the license granted appellee by appellant was rescinded on the further ground that appellant's consent was obtained by Mellin's fraud. We think the trial court's finding to the contrary must be sustained, because the evidence, at most, was conflicting only.

▋ Appellant's brief does not clearly disclose whether or not it is contended that the license granted appellee by appellant was rescinded on the ground of failure of

consideration. If so, the contention is that the license granted appellant permitted use by appellant of ball valves; that the infringement suit was an eviction of appellant, and since appellant was not therefore permitted to operate under the license granted him by appellee, which, it is said, was the consideration for the grant of a license by appellant to appellee, there was a failure of consideration, permitting rescission under the above-quoted statute. As can be seen, this argument is based on the premise that the license granted appellant permitted his use of ball valves. We have, however, held to the contrary. In addition, the trial court's finding was that the monetary consideration was adequate.

Finally it is contended that the agreement to settle pending litigation executed in 1934, and the evidence of performance thereunder, was not admissible, because the agreement of 1935 provided: "This agreement entirely cancels and renders void and of no effect all prior agreements both written and oral between the parties hereto". We think, however, that since fraud was charged, the evidence of such surrounding circumstances was admissible. 12 Cal.Jur. 830, § 79.

Affirmed.